OPINION OF THE COURT
Martin Marcus, J.
The prosecution of all but certain specified felonies “must be commenced within five years after the commission thereof.” (CPL 30.10 [2] [b].) However, in calculating this time limitation, “[a]ny period following the commission of the offense during which . . . (ii) the whereabouts of the defendant were continuously unknown and continuously unascertainable by the exercise of reasonable diligence” is excluded. (CPL 30.10 [4] [a].) In People v Seda (93 NY2d 307, 311 [1999]), the Court of Appeals held that the phrase “whereabouts of the defendant” includes not only a situation in which “[t]he police may be ignorant of the whereabouts of a perpetrator of a crime where they have identified the perpetrator but lack knowledge of his or her physical location,” but also one in which “they have not identified the perpetrator at all and thus cannot determine where he or she is.” This case raises the novel question whether, when a defendant is charged with a crime only after another person has been charged with the same crime and then exonerated, the time consumed by the prior prosecution should be excluded from the period in which the subsequent prosecution must be brought.
In Seda, the defendant was charged with three counts of attempted murder and related crimes arising out of three shooting incidents, two of which occurred in March 1990. In a series of letters to the New York City Police Department and the New York Post, a person identifying himself only as “The Zodiac” *207 had claimed responsibility. As the Court of Appeals noted, “[f]rom 1990 until 1996, the police conducted extensive investigations in an effort to find the so-called ‘Zodiac Killer.’ ” (Seda, 93 NY2d at 309.) Finally indicted on August 20, 1996, the defendant moved to dismiss the charges arising out of the March 1990 shootings, claiming that because they were brought more than six years after the shootings had occurred, they were barred by the statute of limitations.
The Court of Appeals observed that in enacting the statute of limitations, the legislature “carefully balanced the general policy in favor of avoiding prosecution of stale cases against the countervailing policy of ensuring that law enforcement officers have sufficient time to bring suspected criminals to justice by imposing important limitations on the tolling exceptions.” (Id. at 311.) Significantly, the Court noted that “[t]he ‘reasonable diligence’ requirement is certainly a deterrent to delaying an investigation, as no automatic toll is contemplated.” (Id. at 312.)
Explaining that “[t]he focus of the tolling exception rests on the difficulty of finding the defendant whether or not the police are aware of his or her identity,” the Court concluded that
“[i]n light of the extensive and prolonged police manhunts for ‘The Zodiac Killer,’ there is ample record support for the Appellate Division’s finding that, during the six-plus year period from the March 1990 shootings until defendant’s arrest in June 1996, his whereabouts were continuously unknown and continuously unascertainable by the exercise of reasonable diligence.” (Id.)
Accordingly, the Court held that pursuant to CPL 30.10 (4) (a) (ii), the statute of limitations was tolled during that period.
In this case, the defendants are charged with one count each of attempted murder in the second degree, assault in the first degree, robbery in the third degree and burglary in the third degree, and two counts each of robbery in the first and second degrees and burglary in the first degree. The charges arise out of a September 6, 2005 home invasion and robbery during which the victim, George Peseo, was shot. The above-captioned indictment was filed on October 9, 2014, more than nine years and one month later. In their omnibus motions, the defendants move to dismiss the indictment, alleging that it was filed after the statute of limitations had expired. The People oppose the defendants’ motions, asserting that the statute was tolled dur *208 ing the period in which two other women were prosecuted for the crimes with which they are now charged, until February of 2013, when the attorneys for those other women presented them with “compelling evidence” that they had been wrongfully convicted.
The Crime
According to Peseo’s September 17, 2014 grand jury testimony, on September 5, 2005, he met two young women on Eighth Avenue in Manhattan and brought them to his apartment, located at 964 Sherman Avenue in the Bronx. After spending some time in the apartment, the women indicated that they wanted to bring their belongings there, and Peseo drove them back to Eighth Avenue, where they got their “stuff.” The three then returned to Peseo’s apartment, where they spent the night, one on the couch and the other in his room.
The following day, Peseo dropped the women off at Harlem Hospital and drove home. After the women returned that evening, Peseo quarreled with one them, who asked him for money. One of the women borrowed Peseo’s phone and called a man, complaining to him that somebody — presumably Peseo — was trying to take advantage of them. The man asked for Peseo’s address and the woman gave it to him. Thereafter, Peseo called a friend, Frank Nti, and asked him to come over. Nti did so and gave the woman some money. Both women then left, saying they would be back.
Later that night, the women did come back, accompanied by some men. An altercation ensued in which they asked Peseo where his money was, took his phone from his pocket, and roughed him up. One of the men shot him in his abdomen. The next thing Peseo remembered, he was in the hospital. Peseo testified that he had been unconscious for two weeks or more and had been unable to walk for about a month. He later spent time in a rehabilitation facility and, as of his September 2014 grand jury appearance, remained unable to work and on disability.
The Investigation*
In response to a radio run of shots fired, night watch detectives arrived outside the apartment building, where they *209 encountered Peseo, shot once in the abdomen and once in the chest, with duct tape wrapped around his neck. After Peseo was taken to the hospital, the detectives spoke to two witnesses, Wayne Johnson and Angela Rodriguez. Both said they had seen two men and two women enter the building. Rodriguez thought he recognized one of the women as an acquaintance of another man who lived there. Johnson said he had gone up to the door of apartment 2C, where he heard loud music and an argument between a man and a woman. Thereafter the two men and two women brought heavy black garbage bags, a television and a computer out of the building, loaded them into a Ford Expedition and drove off. After that, Peseo came out of the building, stating that he had been shot.
Later that day, Detective Steven Smith, the lead investigator on the case, interviewed Nti, who told him that one of the women had used his cell phone to call a man whom she told she was having problems with Peseo. On September 19, 2005, Detective Smith interviewed Peseo, who recounted the three visits of the women to his apartment. He said that in the last visit they had been accompanied by two or three men, one of whom accused him of having sex with his “sister.” An altercation ensued, in which Peseo was tied up, shot and thrown into his closet. Peseo also mentioned that the two girls had made calls from his cell phone.
On September 30, 2005, Detective Smith subpoenaed subscriber information and call histories for three phone numbers that he thought were likely called from Peseo’s and Nti’s cell phones during the home invasion. On October 1, Detective Smith again interviewed Peseo, who said he believed that the girls had called two of the numbers, (xxx) xxx-3042 and (xxx) xxx-7379. The former number belonged to Tyrone Johnson, whose daughter, Latisha Johnson, had a criminal record, which included an arrest for prostitution. Detective Smith obtained a photograph of Johnson, a light skinned black woman, whom he thought generally fit the description Peseo and Nti had given of one of the women. Detective Smith then created a photo array that included Johnson’s photograph and showed it to Peseo, who identified Johnson as one of the two women. Detective Smith then issued an “I-card” for Johnson.
On October 11, 2005, Detective Smith was notified that Johnson had been arrested along with Malisha Blyden and that both women had active warrants. Detective Smith brought Johnson to the 44th Precinct, where she told Detective Smith *210 that she and Blyden were close friends. Detective Smith created a photo array that included Blyden’s photograph. Another detective took the array to Peseo in the hospital, and Peseo identified Blyden as the second woman. Later that night, Johnson made an oral statement to Detective Smith concerning her involvement in the home invasion. The following morning, she gave a detailed written statement to Detective Smith and a videotaped statement to an assistant district attorney in which she stated that she had been one of the two women in Peseo’s apartment.
While being questioned at the precinct, Johnson identified single photographs of Michael Barnes and Nathaniel Potts as two of the three “boys” she said had been involved in the home invasion. Two calls from Peseo’s phone had been made to Potts’ phone during the evening of September 6th, after Peseo’s phone had been stolen, and while Peseo had been sedated at Lincoln Hospital. Shown photo arrays that included photographs of Barnes and Potts, Peseo identified them as two of the men in the home invasion.
On October 20, 2005, Potts was arrested. The following day he made a videotaped statement to an assistant district attorney, denying his involvement in the home invasion. He also claimed that around the time of the crime he had received phone calls from his ex-girlfriend, Latreese, from a phone number he did not recognize. In the calls, Latreese said she had been involved in a robbery with another girl and some guys. When the assistant district attorney showed him photographs of Blyden and Johnson, he said he did not recognize either of them.
On February 23, 2006, Johnson and Blyden were indicted for attempted murder in the second degree and related charges. Potts was also indicted in connection with the home invasion.
Using the phone records for Peseo’s phone, Detective Smith identified and located two other witnesses, Mario Nogueira and Shermaine Maitland. Detective Smith spoke to Nogueira in late February 2007, and Nogueira told him that in 2005 he had been living in an apartment with his girlfriend and rented out a bedroom to Terrell Davis. Two of Davis’s friends, Kashawn Rowson and Jonathan Casanova, spent time at the apartment. “Jackie” and “Lace,” who worked for Casanova, also rented a room in the apartment, along with Maitland. Nogueira told Detective Smith that over Labor Day weekend in 2005, he overheard the men, as well as “Jackie” and “Lace,” plan the *211 robbery of Peseo, and they enlisted Nogueira to drive Peseo’s car from the Bronx back to Manhattan. Both Nogueira and Maitland implicated “Jackie” and “Lace,” as well as Casanova, Davis, Rowson and another man, Jeffrey Graves, in the home invasion, and both identified Latisha Johnson as “Jackie” and Malisha Blyden as “Lace.” Based on their testimony, the four men were indicted.
Court Proceedings
The Honorable Megan Tallmer conducted a pretrial hearing in January, March and April of 2007. At the close of the hearing, Judge Tallmer found there was probable cause for the arrest of Johnson and Blyden, that the photo arrays including their photographs were not unduly suggestive, and that Nogueira and Maitland were sufficiently familiar with Johnson and Blyden that displaying single photographs of them to Nogueira and Maitland would not taint in-court identifications. Although a Huntley hearing had been ordered, because the People indicated they did not intend to offer Johnson’s statements at trial, Judge Tallmer did not determine whether the statements were voluntary.
At trial, Peseo identified Johnson and Blyden. Nti initially identified only Johnson, although later in his testimony he said Blyden was the one who had told Peseo that they would be back. Testifying under a cooperation agreement, Nogueira identified Johnson as “Jackie” and Blyden as “Lace,” but noted that they had “gained weight, their hair [was] different, [and] they [didn’t] look as healthy as they did before.” Maitland also identified Johnson as “Jackie,” but first testified that she did not recognize “Lace” in the courtroom, and only later said she “suppose [d]” “Lace” was Blyden. Jasmine Dalton, Nogueira’s girlfriend, first identified Johnson as “Lace” and Blyden as “Jackie,” but later said she was nervous and had confused their names. The defendants called Diamond Speights as a trial witness. She testified that she had lived with Casanova in the summer of 2005, that she knew “Jackie” and “Lace,” that she could identify them, and that she was positive that the defendants in the courtroom were not “Jackie” and “Lace.”
During the defense case, Johnson’s attorney brought to Judge Tallmer’s attention evidence that had previously been redacted from the copy of Peseo’s phone records provided to him, which indicated that Peseo had repeatedly called a number only one digit different from the number in those records that had led *212 Detective Smith to Johnson. Arguing that this evidence established that the call was a misdial, Johnson’s attorney moved for a mistrial. After Judge Tallmer denied the motion, Johnson’s attorney called witnesses who placed before the jury the evidence in support of his theory. None of the physical evidence the police had collected connected Johnson or Blyden to the crime scene.
On June 11, 2007, Johnson and Blyden were convicted on all counts. The defendants later moved to set aside the verdicts based upon a newly discovered witness and an alleged Brady violation arising out of the redacted phone records. Judge Tallmer conducted a hearing on the motions in October and November of 2008, in which the defendants called Juanita Moore as a witness. Moore testified that she was living in a Harlem apartment next door to Nogueira, and that, in the summer of 2005, a girl named “Jackie” and another girl, as well as Rowson, Graves, Davis, Dalton and others frequented Nogueira’s apartment. She also testified that in September of 2005, while on an elevator with Casanova, Nogueira, Rowson, Davis and others, she overheard Casanova tell two women, Michelle and Toya, they were going to “do” a robbery the following day. The next day she saw Nogueira pull up in a green Jeep with Casanova, Davis and Rowson. When she asked where they had gotten the Jeep, Nogueira said that they had just robbed “this guy in the Bronx,” and he had been the getaway driver.
Moore also testified that she met Blyden when both were incarcerated on Rikers Island, and that she told Blyden that she thought they “got the wrong girls,” since she knew Blyden and Johnson had not been hanging out or living in Nogueira’s apartment that summer. In an interview before the hearing, Moore was shown a photograph of Latreese Shufford. Moore identified Shufford as “Jackie,” but said “Jackie” had not been involved in the home invasion, that she thought it had been Michelle and Toya instead. Moore was impeached with an affidavit and a written statement arising from the interview, both of which she claimed not to have read before signing.
In February 2009, Judge Tallmer denied the defendants’ motions to set aside the verdict, finding Moore’s testimony incredible and concluding that the defendants had been able to make effective use of the redacted material at trial. She then sentenced both defendants to 40 years’ imprisonment, stating that she had “no doubt” of the defendants’ guilt.
*213 In New York County, on January 7, 2010, Jonathan Casanova, Terrell Davis, Kashawn Rowson and Jeffrey Graves entered guilty pleas under New York County indictments that also resolved the charges against them from the Peseo home invasion and shooting. In their plea allocutions, each of the defendants stated that they had acted in concert with Johnson and Blyden.
The First Department affirmed Blyden’s conviction (People v Blyden, 83 AD3d 542, 543 [1st Dept 2011]), rejecting the claim that she had been prejudiced by the delayed disclosure of the redacted material, and finding that “the People’s case was overwhelming.” Johnson’s appellate attorneys filed an appeal, but then withdrew it in order to first file a CPL 440.10 motion raising a claim of actual innocence. That motion was filed in February of 2013, after which the appellate attorneys for both defendants met with representatives of the Bronx District Attorney’s Office to present the results of an investigation the attorneys had been conducting for more than a year.
Confronted with the results of the investigation, representatives of the District Attorney’s Office interviewed Nogueira, Maitland, Dalton, Peseo and Potts. All but Peseo were shown a photograph of Latreese Shufford, whom each identified as “Lace.” On January 14, 2014, representatives of the District Attorney’s Office interviewed Shufford, who had “Lace” tattooed on the back of her neck, and who admitted that she and her friend “Jackie” had participated in the home invasion. On January 17, 2014, representatives of the District Attorney’s Office interviewed Jacqueline Misodi, who had “Jackie” tattooed on the back of her neck, and who also admitted participating in the crime.
As a result of these interviews, the People determined that Jacqueline Misodi and Latreese Shufford were “Jackie” and “Lace.” On January 16, 2014, with the People’s consent, the Hon. Ethan Greenberg granted Johnson’s and Blyden’s motions to vacate the judgments against them. On March 11, 2014, again with the People’s consent, the indictments against them were dismissed. On October 9, 2014, nine years and one month after the home invasion had occurred, the defendants Shufford and Misodi were indicted.
Analysis
The defendant Misodi argues that the People did not exercise reasonable diligence in ascertaining her identity and location, *214 having chosen to prosecute others for the crimes with which she and her codefendant are now charged. Similarly, the defendant Shufford maintains that had the People exercised due diligence in investigating the crimes, they could have learned her identity. While the People acknowledge that no attempt was made to locate the defendants at any time before 2013, they argue that
“[t]he evidence that led detectives, prosecutors, a jury and a judge to conclude that Malisha Blyden and Latisha Johnson were the female perpetrators involved in the instant matter — and, concomitantly, hid the identities of Jacqueline Misodi and Latreese Shufford — was the result of the exercise of reasonable diligence in the investigation of the crime.”
Thus, they insist that, within the meaning of CPL 30.10 (4) (a) (ii), “the whereabouts of the defendant [s] were continuously unknown and continuously unascertainable by the exercise of reasonable diligence.” The People have the burden of establishing beyond a reasonable doubt that the limitations period has been tolled. (People v Kohut, 30 NY2d 183, 191 [1972].)
The People’s argument turns on the “reasonableness” of the decision the police made to focus on Blyden and Johnson and to ignore the information that from early on could have led the police to expand their investigation. They insist that the identifications and statements consistent with Johnson’s and Blyden’s guilt justified the single-minded focus on them. However, given that the identifications proved erroneous and the statements false, it appears that both were more likely the product of that focus (and perhaps of suggestion, inadvertent or otherwise), rather than a justification for it.
The first step toward an identification came from Peseo’s phone records, which brought Detective Smith to Tyrone Johnson, whose daughter fit the description Peseo and Nti had given of one of the women, and whose photograph Peseo identified in a photo array. As it turned out, however, the connection to Johnson was based on an apparent misdial that led the investigation down the wrong path. That it may have been a misdial should have been evident from a more careful examination of the phone records.
The information that Potts provided after his October 2005 arrest — denying his guilt, stating that he did not recognize photographs of Blyden and Johnson, claiming to have received calls from his ex-girlfriend, “Latreese,” from an unknown phone *215 number, who said she had been involved in a robbery with another girl and some guys — could have provided an alternative path for the investigation, which Detective Smith chose not to pursue.
In January of 2007, although Nogueira and Maitland each identified single photographs of Johnson as “Jackie” and Blyden as “Lace,” both said they also knew “Lace” as “Latreese,” the same name as Potts’ ex-girlfriend. Yet, Detective Smith still did not investigate further whether Potts had in fact received a call from someone named “Latreese,” and whether she, instead of Blyden, was one of the perpetrators.
In May of 2007, apparently having concluded that Potts was not involved in the crime, the District Attorney’s Office moved to sever Potts’ case from Blyden’s and Johnson’s, “with a view,” the People say in their motion papers, “to ultimately dismissing the indictment against him.” Barnes was apparently never indicted. It thus appears that as early as May 2007, the People had concluded that Peseo’s identifications of Potts and Barnes were erroneous.
Testimony, taken during the trial, in May and June of 2007, provided further reason to question whether both defendants had been correctly identified as the perpetrators. Initially, Nti was able to identify only Johnson. Nogueira identified both defendants, but noted that the women were heavier, had different hair, and looked less healthy than they did before. Maitland, who at one point had shared a bedroom with “Jackie” and “Lace,” initially said she saw “Jackie” in court, but not “Lace,” and said “Jackie” looked different than she did when they lived together. When later on direct examination she was asked if Blyden was “Lace,” she answered, “I mean, yes, I suppose.” Jasmine Dalton, Nogueira’s girlfriend in the summer of 2005, first testified that Johnson was “Lace” and Blyden was “Jackie,” and “corrected” her testimony only when she was recalled the next day. On the defense case, Diamond Speights testified that she had lived with “Jackie” and “Lace” in the summer of 2005, and that she was “positive” that Johnson and Blyden were not “Jackie” and “Lace.” Finally, in the posttrial hearing in the fall of 2008, Moore testified that neither Johnson nor Blyden had been hanging out or living in Nogueira’s apartment in the summer of 2005.
In sum, despite the evidence pointing to Johnson’s and Blyden’s guilt, and despite their convictions, there were numerous red flags that appeared along the way: (1) Potts’ statement *216 implicating “Latreese”; (2) the information from Nogueira and Maitland also implicating “Latreese”; (3) the People’s own conclusion that Peseo and Johnson had both misidentified Potts and Barnes; (4) the equivocal identifications of Johnson and Blyden during the trial; (5) the information presented at the trial (but in the People’s possession long before that) suggesting that the call on Peseo’s phone was likely a misdial; and (6) Moore’s hearing testimony that neither Blyden nor Johnson had been hanging out in Nogueira’s apartment. Ignoring this accumulating evidence pointing away from Johnson and Blyden, neither the police nor the prosecution further investigated until February of 2013, when prodded to do so by the information provided by Johnson’s and Blyden’s appellate attorneys.
The People attempt to excuse the failure to investigate these red flags by pointing out that the issues they raised were placed before the jury and the court at trial and were rejected. However, the jury and Judge Tallmer did not have before them all the information obtained in the investigation that was conducted before the trial. More importantly, they also did not have the other information, then unknown even to the People, that the police and prosecution might well have obtained had they followed up on those red flags. While the People speculate that, had the investigation been broadened earlier, it might not have led to the identification of the defendants as “Lace” and “Jackie,” such speculation does not constitute proof beyond a reasonable doubt.
The People also argue that the defendants themselves contributed to the inability of the police to determine their “whereabouts,” pointing to their “transient existence,” that they “lived anonymously,” were only known by their first names or nicknames, and perhaps spent some time out of state. Here, too, the People speculate that they might not have been able to locate the defendants had they looked for them anytime between 2005 and 2008, but the fact remains that they did not look, and, again, such speculation does not constitute proof beyond a reasonable doubt.
Indeed, there is reason to believe that had the police tried to find the defendants, they could have done so. Although the People lament that if a witness “had simply been able to say that ‘Lace’ was Latreese Shufford and ‘Jackie’ was Jacqueline Misodi,” it would have been easier to apprehend them, they did, in fact, have several witnesses who said essentially that. *217 Nogueira and Maitland both said “Lace” was also known as “Latreese,” Potts implicated his ex-girlfriend “Latreese” in the crime, and as of June of 2007, the People even had access to a photograph of Latreese Shufford. Almost all of the witnesses of which the police were aware had some connection to the real “Jackie” and “Lace,” the police knew where the women had resided, and they had Casanova — the man “Jackie” and “Lace” spent the most time with — in their custody, as were all the other male participants in the crime.
For these reasons, I cannot conclude that the People have proved beyond a reasonable doubt that for the period of time beyond the five-year statute of limitations “the whereabouts of the defendant [s] were continuously unknown and continuously unascertainable by the exercise of reasonable diligence.” (CPL 30.10 [4] [a] [ii].) Accordingly, the defendants’ motions are granted and the indictment against them is dismissed. Given this result, the defendants’ other motions need not be considered.

 The history of the case described below is taken from the People’s motion papers. The defendants do not dispute the People’s account.